UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DEBORAH LYNN ADKINS, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil A. No. 16-12019-LTS |
| NANCY A. BERRYHILL, | ) ) ) | |
| Defendant. | ) ) | |

MEMORANDUM AND ORDER

December 12, 2017

SOROKIN, J.

The plaintiff, Deborah Lynn Adkins, seeks reversal and remand of a decision by the defendant, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying her Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Doc. No. 13. The Commissioner seeks an order affirming her decision. Doc. No. 26. For the reasons that follow, Adkins' Motion to Reverse and/or Remand the Decision of the Commissioner is DENIED, and the Commissioner's Motion to Affirm the Commissioner's Decision is ALLOWED.

I. BACKGROUND

A. Procedural History

In February of 2014, Adkins applied for SSI and DIB, alleging that she became disabled on June 1, 2012. A.R. at 11.[1] Her applications were denied initially on April 24, 2014 and

---

[1] Citations to "A.R." are to the administrative record, which appears as Document 11 on the docket in this matter. Page numbers are those assigned by the agency and appear in the lower right-hand corner of each page.

upon reconsideration on August 11, 2014. Id. On August 19, 2014, Adkins requested a hearing before an administrative law judge ("ALJ"). Id. Adkins appeared, represented by counsel, and testified at her June 30, 2015 hearing, which also featured testimony by a vocational expert Amy Vercillo. Id.

Thereafter, the ALJ issued a written decision denying Adkins' applications. Id. at 12. Adkins' timely request for review by the Appeals Council was denied, id., rendering the ALJ's determination the final decision of the Commissioner. Adkins filed this action appealing the Commissioner's decision on October 6, 2016. Doc. No. 1.

B. Adkins' Physical Impairments

In the paperwork accompanying her applications, Adkins claimed she suffered from severe physical impairments including thoracic outlet syndrome ("TOS"), Paget-Shroetter syndrome ("PSS"), transient ischemic attacks, and Raynaud's syndrome.[2] A.R. at 234. The administrative record contains the following relevant evidence regarding Adkins' alleged physical impairments:

- Adkins was in a "usual state of good health until December of 2007," when she began experiencing pain in her right arm and swelling. Id. at 350.

- In December of 2007, Adkins was diagnosed with TOS with PSS resulting from it. Id. at 37, 901. Adkins underwent surgery in 2008 and again in 2009 to treat the conditions. Id. at 36, 898.

---

[2]Adkins also cited various mental ailments. The ALJ did not find any of these ailments to be severe, id. at 14, and, in this action, Adkins has not challenged the ALJ's assessment of those impairments. Doc. No. 14 at 9-17. As such, the Court need not catalogue that portion of the record or review the ALJ's findings in that regard here.

2

- After the surgeries, Adkins' swelling and pain initially decreased; however, her symptoms later returned with increased pain. Id. at 350.

- From 2010 to 2012, Adkins continued to experience swelling, pain, and muscle spasms. Id. at 61, 350. To manage these symptoms, Adkins participated in physical therapy. Id. at 62. She also used muscle relaxers, blood thinners, and Heparin therapy. Id. at 63-64.

- In May of 2012, Adkins graduated from Harvard University with a Bachelor of Science Degree.[3] Id. at 39, 41-42. Adkins intended to continue her education with an additional two years of study at Northeastern University but was deterred by her daily pain. Id. at 40.

- While a student, Adkins lived in Dorchester and commuted to school. Id. at 43-44. She took many of her classes online. Id. She typically spent three hours at a time online to complete her assignments. Id. at 44.

- During this time, Adkins lived at the Salvation Army Jubilee House. Id. A requirement of living at the house is volunteer work. Id. To fulfill this requirement, Adkins mentored and tutored students and performed office work "like answering the phones" and "hosting groups." Id.

- Adkins has had difficulty finding a medication routine that works for her. Initially, she used the muscle relaxer Tizanidine and the blood thinner Lovenox

---

[3] Adkins earned her degree through the Harvard Division of Continuing Education, which "offers open-enrollment" and allows students to "study online or on campus," and to engage in "flexible credit or noncredit courses." Harvard Extension School, Harvard University, http://www.dce.harvard.edu/ (last visited Dec. 1, 2017). Adkins took the majority of her courses online. A.R. 61.

3

until the medications inflamed her liver, causing toxic hepatitis. Id. at 63-64, 316. Adkins switched to a new blood thinner Coumadin but was unable to consistently reach proper blood thinness levels on the drug. Id. She also used the medication Neurontin to manage her pain but developed edema (fluid retention) as a side effect and so discontinued its use. Id. at 350. She tried a Butrans patch to help with chest pain, but experienced headaches, nausea and increased pain so discontinued the patch's use. Id. at 382-83, 536.

- While a student at Harvard, Adkins also underwent Heparin therapy every three to four months to treat blood clots. Id. at 66. The typical treatment lasted fifteen days. Id. Adkins experienced side effects as a result of the treatment, including vomiting and generally feeling unwell. Id. at 67.

- Recently, Adkins has had "benefits with heat and Dilaudid," a pain medication. Id. at 350.

- On June 4, 2012, Adkins met with Dr. Dean Donahue at Massachusetts General Hospital ("MGH"), complaining of swelling and pain in her right hand. Id. at 67, 453. At the visit, Adkins also reported a general decline in her ability to function and increased pain and muscle spasms, and expressed a fear "that she might not be able to commit 100% to work with her ongoing pain issues." Id. at 67-68, 453.

- At this time, Adkins increased her use of Dilaudid to manage her pain, but then "resumed her habit of taking [it] only [] for strong pain . . . and often [not] as all." Id.

- During the June 4, 2012 examination, Dr. Donahue found Adkins' range of

motion to be normal, and found that she had five out of five in muscle strength in all major muscle groups except her right upper extremity which Dr. Donahue found to have four out of five strength. Id. at 454. Dr. Donahue also found that Adkins is "able to deal with flare-up of pain . . . with limited amount of medication and medical support" and has "the ability to tolerate pain most days." Id.

- From 2012 to 2014, Adkins visited MGH and Beth Israel Pain Management Center dozens of times and saw numerous doctors, including Dr. Donahue, pain management physicians, vascular physicians, cardiologists, a neurologist, and a rheumatologist. Id. at 68-69, 318-422, 415-19, 453-54, 529-35, 668-80, 907, 1416-19. The most significant of these visits, for the purposes of the issues presented here, are summarized in the paragraphs that follow.

- On November 11, 2012, Adkins visited the emergency department at MGH after experiencing severe abdominal pain while riding a recumbent bike at the gym. Id. at 428. All of her laboratory tests were normal, and she was discharged. Id. at 336-67.

- In March of 2013, Adkins again visited the emergency department at MGH, complaining of chest pain and dizziness. Id. at 427-34. After she was discharged, she followed up with her pain management physician. Id. at 421. Her physician found her to possess full range of motion, normal gait, and sensation. Id. at 421-22. In April of 2013, Adkins had another episode of chest pain. She visited MGH on April 24, 2013 and was found to have a normal MRI. Id. at 392.

- On April 29, 2013, Adkins returned to the emergency room complaining of chronic pain, chest pain, shortness of breath, blurred vision, and light headedness. Id. at 312, 317. Her attending physician was unable to find the source of her pain. Id. at 394. She was found to have normal range of motion, reflexes, and coordination; her lungs, heart, and chest were found to be normal; she was found to "abulate[] with steady gait;" and was discharged with permission to engage in "activity as tolerated." Id. at 312, 321, 331, 394.

- In August of 2013, Adkins began engaging in osteopathic manipulative treatment, from which she found "excellent relief." Id. at 382-84, 530-36, 543-44, 550-51, 554-57.

- In February of 2014, Adkins began experiencing episodes of chest pain, shortness of breath, confusion accompanied by word-retrieval difficulties, headaches, and blurred vision. Id. at 353, 359-72. On February 22, 2014, she was evaluated for cognitive issues. Id. Her attending physician had "difficulty classifying" her case and was "unable to establish a clearcut [*sic*] diagnosis for her." Id. She was found to be "awake and alert," as well as "oriented" with "normal range of motion for all limbs and joints" and that she had a "normal intact gait." Id. at 365-69.

- On March 10 of 2014, Adkins again visited MGH complaining of neck and chest pain. Id. at 350. She described engaging in occupational therapy and using heat and Dilaudid with "mild benefit" but felt that she was "unable to go back to work due to the stressors in her life." Id. She also described her pain as "mostly deep and aching" with occasional exacerbation "by light touch." Id.

She was discharged with instructions to continue her use of Dilaudid, Valium, and osteopathic treatment. Id.

- On May 23, 2014, Adkins visited MGH complaining of chronic pain and increased spasms. Id. at 672. She also reported difficulty in coordination of her hands. Id. Her laboratories were normal, and she was again instructed to continue her use of Dilaudid, Valium, and osteopathic therapy. Id. at 672-73.

- In September of 2014, Adkins traveled to Ohio to be with her father because he was ill. Id. at 44-45, 1454. She remained in Ohio until March of 2015, caring for her father and assisting her mother with finances. Id. at 52. Adkins left her prescription refill in Boston and so did not use prescription medication during the time that she was in Ohio. Id. at 1454. She also did not seek out occupational or physical therapy while in Ohio. Id. at 45.

- When Adkins returned to Boston in March of 2015, she again sought medical treatment at Beth Israel's Pain Management Center. Id. at 1454. At her appointment, she reported that, while in Ohio, her spasms had been "particularly bad in December and January but better in February." Id. Her attending physician found that Adkins was "in no apparent distress" and that her "[g]ait was intact without assistance." Id. at 1455. The physician prescribed continued use of Dilaudid and Adkins' return to physical therapy. Id. at 1456.

- On March 20, 2015, Adkins visited the emergency room at MGH complaining of chest pain which she described as "radiat[ing] through her entire chest . . . up into her jaw." Id. at 1445, 1448. Her attending physician found her to be "awake and alert." Id. at 1446. He consulted with her cardiologist who said that

7

her pain was not cardiac and that there was a "high likelihood of malingering." Id.[4] She was advised to follow up with her doctors. Id.

- On April 16, 2015, Adkins returned to Beth Israel's Pain Management Center for a follow-up visit. Id. at 1460. At the visit, Adkins reported pain and symptoms consistent with previous visits. Id. She also reported continuing "her medications as directed with good relief." Id. Her attending physician again found her "alert and oriented" and in "no apparent distress." Id. at 1461. She experienced decreased sensation, which was "very mild," and her judgment, strength, gait, and reflexes were all found to be normal. Id. at 1461-62.

- Adkins reports that the pain, spasms, and cognition issues that she experiences limit her functional capabilities "[a]ll day every day." Id. at 61, 70-71. She complains of "loss of strength," "increased dropping," and difficulty with "lifting things," "turning things," and "holding things" by her right arm. Id. She "cannot put [her] arms above [her] head." Id. at 72. She needs "frequent rest breaks and lying flat" sometimes as often as "every 20 minutes," where she needs to "lie down supine for greater than 30, 60 minutes." Id. She has described her primary stressor as "the fact that the pain is pretty bad." Id. at 94.

- Despite her pain, Adkins maintains a daily routine. Id. at 73-74. She begins by showering and dressing. Id. at 73. She prepares daily meals, and takes care of personal business, including returning emails and filling out paperwork. Id. at

---

[4] Malingering is "the intentional production of false or grossly exaggerated physical or psychological symptoms motivated by external incentives." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 739 (4th ed. 2000).

8

74.

- Adkins lives in a third-floor apartment with no elevator. Id. at 77. She has trouble going up to her apartment but lives there "because it was reasonable." Id. at 78.

- In April of 2014, a state agency physician completed a Residential Functional Capacity Assessment of Adkins, after having reviewed her records. Id. at 95-104. The physician found Adkins' statements to be "partially credible." Id. at 96. The physician determined that Adkins' had some postural and manipulative limitations, including never being capable of climbing ladders, ropes, or scaffolds, a limited ability to crawl, and a limited ability to reach overhead. Id. at 99.

C.     The Administrative Decision

After determining Adkins met the insurance requirements of the Social Security Act during the relevant time period, the ALJ conducted the usual five-step sequential evaluation to determine Adkins' disability claim.[5] See Id. at 12-13 (describing the five-step analysis required by the Social Security Act). At step one, the ALJ observed that Adkins had not engaged in substantial gainful activity since the date on which she alleges her disability

---

[5] The five steps of the requisite analysis are: 1) whether the claimant is engaged in substantial gainful activity (if so, she is not disabled and the inquiry ends); 2) whether the claimant has a severe impairment or combination of impairments that is severe (if not, she is not disabled and the inquiry ends); 3) whether any of the claimant's impairments meet or medically equal an impairment listed in an appendix to the relevant regulations (if so, she is disabled and the inquiry ends); 4) whether the claimant is able to perform her past relevant work (if so, she is not disabled and the inquiry ends); and 5) considering the claimant's age, education, work experience, and RFC, whether she is able to perform other work (if not, she is disabled). See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

began. Id. at 13. At step two, the ALJ found Adkins suffers from severe TOS, severe status post rib resection surgery, and severe PSS. Id. at 15-16. At step three, the ALJ found that none of Adkins' conditions met or equaled those impairments listed in the relevant appendix to the regulations—a finding that Adkins does not dispute here. Id. at 16.

After step three, the ALJ considered Adkins' residual functional capacity ("RFC"),[6] and found that Adkins has "the residual functional capacity to perform sedentary work"[7] except that she "is limited to no more than occasional pushing, pulling, and overhead reaching bilaterally, and is limited to no more than occasional postural maneuvers, and must avoid climbing ladders/ropes/scaffolds and concentrated exposure to unprotected heights and hazardous machinery." Id. at 17. In reaching her conclusion, the ALJ considered medical opinion evidence, Adkins' testimony about her symptoms, and medical records from Adkins' treating physicians. Id. at 17-19. The ALJ gave "little weight" to the medical opinion evidence from the State agency medical consultants because the consultants "did not review the entire medical record." Id. at 19. The ALJ instead primarily relied upon the "longitudinal objective medical evidence" and "several of the claimant's own reports." Id.

With the RFC determination in mind, as well as the testimony of the VE, the ALJ concluded at step four that Adkins was able to return to her past work as a rehabilitation program coordinator and as a secretary. Id. at 19-20. Accordingly, the ALJ concluded that Adkins has not been under a disability as defined in the Social Security Act from the date of

---

[6] An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 CR 404.1520(e), 404.1545, 416.920(e).

[7] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R §§ 404.1567(a); 416.967(a).

the alleged onset through the date of the ALJ's decision. Id. at 20.

## II. LEGAL STANDARDS

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Id. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." Richardson v.Perales, 402 U.S. 389, 401 (1971); accord Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); see Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003) (noting substantial evidence is less than a preponderance of the evidence). Conversely, where the Commissioner's finding is not supported by substantial evidence or is the result of an error of law in the evaluation of the claim, the Court will not uphold it. § 405(g).

Where the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991); see Richardson, 402 U.S. at 399 (noting resolution of conflicts in evidence, including medical evidence, is the Commissioner's task). As the Supreme Court has emphasized, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 523 (1981) (internal quotations omitted). Administrative findings of fact are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

Moreover, an ALJ is not permitted to "substitute his own layman's opinion for the findings and opinion of a physician," Gonzalez Perez v. Sec'y of Health & Human Servs., 812 F.2d 747, 749 (1st Cir. 1987), nor may he disregard relevant medical evidence, Nguyen, 172 F.3d at 35.

III. DISCUSSION

Adkins urges that, in reaching her decisions, the ALJ ignored evidence and misapplied the law. Doc. No. 14 at 10. Specifically, Adkins argues that the ALJ failed to apply the "proper standard to assess the effect of pain on [Adkins'] ability to do work." Id.

### A. The ALJ's Determination of Adkins' Credibility

"When [a] claimant indicates that pain is a significant factor of [her] alleged inability to work . . . it is essential [that the ALJ] investigate all avenues presented that relate to subjective complaints," Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 28 (1st Cir. 1986), including:

1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
2. Precipitating and aggravating factors;
3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;
4. Treatment, other than medication, for relief of pain;
5. Functional restrictions; and
6. The claimant's daily activities.

Id. at 29; accord Rohrberg v. Apfel, 26 F. Supp. 2d 303, 308 (D. Mass. 1998). The ALJ "must consider each of these factors" but need not make "specific findings regarding each of the factors in [her] written decision." Shields v. Astrue, No. CIV.A. 10-10234-JGD, 2011 WL 1233105, at *11 (D. Mass. Mar. 30, 2011); accord Rand v. Barnhart, 357 F. Supp. 2d 361, 368 (D. Mass. 2005).

Adkins argues that the ALJ's assessment of her subjective experience of pain was inadequate because the ALJ did not investigate the nature, duration, frequency, or intensity of her pain; the precipitating and aggravating factors; or treatment. Doc. No. 14 at 16.

12

The ALJ's assessment was not inadequate. In her decision, the ALJ discusses Adkins' subjective assessment of her pain and the difficulties that it has caused her. A.R. at 17 (discussing Adkins' reports of "pain, spasms, decreased energy . . . and symptoms caus[ing] totally disabling difficulty with performing personal care and daily tasks"); Id. ("The claimant alleges dropping things, having to lie down during the day every 20 minutes, and decreased memory . . ."); Id. at 18 (noting Adkins "reported ongoing pain."). The ALJ decision also describes the pain management treatment and emergency medical treatment that Adkins received on an ongoing basis, finding that Adkins' medical records "do show upper body pain." Id. Furthermore, during the hearing, the ALJ questioned Adkins about the duration and onset of her alleged disability. Id. at 36-37. The ALJ also questioned Adkins about her experience as a student at Harvard and her pain during that time, as well as her time in Ohio, and her volunteer work at the Salvation Army Jubilee House in Dorchester. Id. at 42-43, 47-48, 51. During the hearing, Adkins explained that the weather was an aggravating factor in her illness and described her daily functional limitations, including her need to "lay flat" frequently throughout the day because of her pain. Id. at 72. The ALJ asked Adkins about for how long she needs to "lay flat." Id. The ALJ considered this evidence but ultimately found Adkins' statements about the intensity, persistence, and limiting effects of her pain were "not entirely credible." Id. at 17. The ALJ came to this conclusion because Adkins' "subjective allegations of totally disabling pain and symptoms" were inconsistent with "the longitudinal objective medical evidence," as well as with some of Adkins' "own reports/admissions." Id. at 17-18.

An ALJ's adverse assessment of a claimant's credibility "is given considerable deference and, accordingly, a reviewing court will rarely disturb it." Ferreira v. Astrue, No. CIV.A. 10-11983-NMG, 2012 WL 1085522, at *7 (D. Mass. Mar. 29, 2012); accord Genereux v. Berryhill,

13

No. CV 15-13227-GAO, 2017 WL 1202645, at *5 (D. Mass. Mar. 31, 2017) ("[T]he ALJ's credibility determination is entitled to deference") (quotations omitted). Here, the ALJ's assessment is supported (1) by the medical records, which show "repeated objective findings of intact strength, sensation and gait," A.R. at 17; (2) by Adkins' own report of "not always having to take pain medication," and of performing an array of activities, including "chores, driving, shopping, using the computer . . . being able to handle money, socializing with family, taking public transportation, and currently living alone," id. at 18-19; (3) and by the following facts: Adkins successfully graduated with a BS in Science from Harvard, Adkins performed volunteer work by "mentoring, doing office work, being a resident assistant, and hosting groups," Adkins' received no treatment for six months, and Adkins cared for her ailing father and helped manage her family's finances while receiving no treatment, id. 18-19. The ALJ's assessment is also supported by the opinion of Adkins' cardiologist who suggested "there [was] a high likelihood of malingering." Id. at 1448.

In light of the objective medical evidence, the opinion of Adkins' cardiologist, and Adkins' own admissions and reports, the ALJ determined that Adkins was not fully credible. "Resolution of conflicts in the record [such as the conflict here between the objective evidence in the medical records and Adkins' subjective reports of pain] is the primary responsibility of the Commissioner and the Court must affirm that resolution where, as here, it is supported by substantial evidence." Ferreira, No. CIV.A. 10-11983-NMG, 2012 WL 1085522, at *7.

Here, the ALJ provided a detailed explanation, based on substantial evidence in the record, as to why she made an adverse credibility assessment; accordingly, the Court will not disturb the ALJ's assessment of Adkins' credibility as it is supported by substantial evidence.

B. The ALJ's Characterization of the Evidence

"[T]he drawing of permissible inference[s] from evidentiary facts [is] the prime responsibility of the [ALJ]." Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981). "We must uphold [her] findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support [her] conclusion." Id. While the ALJ's determination "may not be the only conclusion which could have been reached based on the evidence in the record," if her conclusion is reasonable and is supported by "substantial evidence in the record," the Court must uphold the ALJ's findings. See Genereux, No. CV 15-13227-GAO, 2017 WL 1202645, at *4.

Adkins' contends that the ALJ mischaracterized the evidence in the record in several instances, and that the substantial weight of the evidence does not support the ALJ's conclusion. Doc. No. 14 at 9-18. First, Adkins contends that the ALJ erred in relying upon the period of time in which Adkins received no medical treatment as evidence that Adkins' pain was less intense than she alleged. Id. at 11. Adkins argues that six months is a "relatively short period" and the longitudinal record "clearly shows that [Adkins] was suffering from 2008." Id. Adkins provides no basis for the conclusion that six months is a short period. Id. Adkins additionally argues that "lack of treatment is not evidence of medical improvement." Id. at 12 (quoting Rice v. Chater, 86 F.3d 1, 2 (1st Cir. 1996)).

The ALJ relies on Adkins' period of no treatment, not to find "medical improvement," but to find that the "longitudinal objective medical evidence does not support the claimant's subjective allegations of totally disabling pain and symptoms." A.R. at 18. An ALJ may infer from gaps in a claimant's medical record that a "claimant would have secured more treatment had [her] pain been as intense as alleged." Irlanda Ortiz v. Sec'y of Health & Human Srvs., 955

15

F.2d 765, 769 (1st Cir. 1991). Here, Adkins received no treatment for six months. A.R. at 45. Not only did she not receive treatment during this time, but also, while receiving no treatment, she helped her father with *his* medical treatments and helped her mother with family finances. Id. From this evidence, the ALJ reasonably inferred that Adkins pain was not as intense as she alleged.

Adkins also contends that the ALJ mischaracterized the evidence by failing to consider the adverse side effects that Adkins experienced as a result of her treatment. Doc. No. 14 at 12. The majority of the adverse side effects Adkins experienced as a result of her various treatments[8] occurred prior to the alleged onset of her disability and are therefore not relevant here. Id. at 63-64, 351, 374, 383, 676, 680, 1145, 1416-1461. Furthermore, Adkins has since found treatments that bring her relief. Supra 3-4. Adkins has had "benefits with heat and Dilaudid" and "excellent relief" from osteopathic therapy. E.g., A.R. at 350, 382-84, 530-36, 543-44, 550-51. Adkins has used Dilaudid only "sparingly" with "good relief." Id. at 437, 1369, 1460.

Additionally, Adkins argues that the ALJ made an improper finding of medical improvement. Doc. No. 14 at 12-13. The medical improvement standard Adkins cites applies to a person previously found eligible for disability benefits. Doc. No. 14 at 13 (citing 20 C.F.R. § 404.1594(b)(1)). Cf. 20 C.F.R. §§ 404.1594 ("If you are entitled to disability benefits as a disabled worked or as a person disabled since childhood . . . . there are a number of factors we consider in deciding whether your disability continues."). Such persons' eligibility is reviewed periodically, including whether or not there has been a "medical improvement." Id. Adkins has

---

[8] The only exception is the Butrans patch, which Adkins used for only a month from August 12, 2013 until September 9, 2013. A.R. at 382 (describing Adkins' report that she felt the "best [she had] felt in 8 months" after her discontinuation of the patch). The Butrans patch caused Adkins to feel more intense pain and "seizure-ish." Id.

16

never previously been found to be disabled, was not eligible for disability benefits as a child, and is not being considered for continuing eligibility, so that regulation has no application to her case. Here, the ALJ discusses Adkins' admissions of periodic improvements in her condition not as a legal determination of "medical improvement" under 20 C.F.R. §§ 404.1594, but as evidence that Adkins' condition is not as severe as she claims. A.R. at 19.

Adkins' also challenges the ALJ's reliance on her biking, arguing that the ALJ should have considered evidence of Adkins' adverse reactions to biking. Doc. No. 14 at 15. See, e.g. A.R. at 428 (describing "ripping chest pain" Adkins' experienced while biking at gym). She likewise challenges the ALJ's reliance on Adkins' Harvard graduation without considering Adkins' engagement with online coursework.[9] Doc. No. 14 at 16; see A.R. at 61. The ALJ relied on an "array of activities" in reaching her conclusion, including Adkins' biking and Harvard graduation, but also "chores, driving, shopping, using the computer . . . being able to handle money, socializing with family, taking public transportation, and currently living alone." Id. at 18-19. The ALJ relied on the amalgamation of daily activities in which Adkins engages on an ongoing basis to find that Adkins' claim of "totally disabling pain" was not entirely credible. Doc. No. 18. The ALJ's reliance on Adkins' activities was not improper. "[W]hile a claimant's performance of household chores or the like ought not to be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding." Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010). The ALJ therefore properly relied on Adkins' daily activities in her adverse credibility assessment.

---

[9] The fact that Adkins completed the majority of her coursework online does not, as Adkins argues, necessarily signify that Adkins was "not able to attend school in the traditional way." Doc. No. 14 at 16. There is no evidence on the record that Adkins completed her coursework online *because* of her alleged disability. A.R. at 43-45.

17

Furthermore, the ALJ discussed Adkins' reported chest pain following biking. A.R. at 17. She ultimately gave Adkins' reported pain limited weight because the objective medical evidence showed normal musculoskeletal and neurological findings, as well as normal strength, sensation and gait. Id. at 17-18. The ALJ reasonably weighed the conflicting evidence in the record. See MacNeil v. Astrue, 908 F. Supp. 2d 259, 265 (D. Mass. 2012) (deferring to the ALJ's reasonable weighing of evidence where there were inconsistencies in the record).

Adkins also objects to the ALJ's weighing of the evidence generally, arguing that the "ALJ cherrypicked [*sic*] statements from the claimant's medical records in support of her conclusion." Doc. No. 14 at 14. She disputes the ALJ's reliance on the repeated normal medical findings in the record when the "medical records contain much additional information which reveals the severity of the claimant's symptoms." Id. She points to Adkins' reports of neck and chest pain, her reports of taking more "days off due to pain," and her reported feeling of "another episode of thrombosis" as examples. Id. The ALJ did not ignore this additional information in the record, which amounts to Adkins' subjective reports of her pain and symptoms. The ALJ gave this information limited weight because of her adverse credibility assessment, an assessment supported by substantial evidence in the record. A.R. at 18; supra at 13-16.

The ALJ's weighing of the evidence on the record was reasonable and supported by substantial evidence. This Court therefore affirms her conclusions.

## IV. CONCLUSION

For the foregoing reasons, Adkins' motion for an order remanding the Commissioner's decision is DENIED, Doc. No. 13, and the Commissioner's motion for an order affirming her decision is ALLOWED, Doc. No. 26.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge